## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                           Plaintiff,<br><br><br>           v.<br><br>EARTHSOURCE MINERALS INTERNATIONAL, LLC, ABUNDANT RESOURCE DEVELOPMENT, LLLP, JASON M. WENDT, ARMANDO COSTABILE, PREMIER MINERALS INTERNATIONAL, LLC and MICHAEL J. PALERMO,<br><br>                        Defendants. | **COMPLAINT**<br><br>**Case No.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows against Defendants EarthSource Minerals International, LLC ("ESM"), Abundant Resource Development, LLLP ("Abundant"), Jason M. Wendt ("Wendt"), Armando Costabile ("Costabile"), Premier Minerals International, LLC ("PMI") and Michael J. Palermo ("Palermo"):

## SUMMARY

1.      This case concerns two overlapping offering frauds involving the sale of investments related to gold and diamonds in Liberia in which defendants raised more than $5 million from approximately 250 investors.  In soliciting these investments, Defendants misled investors about the safety and security of the investments, the use of investor funds, the extent of the companies' assets and liabilities and the companies' historical production and profitability.

2.      From at least September 2014 through December 2019, Wendt and Costabile, through their companies, ESM and Abundant, fraudulently induced at least 234 investors to purchase more than $4.7 million in securities, the proceeds of which were to be used to fund ESM's mining business in Liberia.

3.      For example, in communications with prospective investors, Wendt and Costabile falsely stated that certain investments were "secured," when they were not, and grossly underreported ESM's liabilities, leading investors to believe that ESM owed only $100,000 when liabilities actually exceeded $4 million.  In one offering, ESM, Wendt and Costabile inflated the profits investors could expect by underreporting certain expenses, falsely claiming that ESM was required to pay royalties of 20% when, in fact, royalties were 55%.

4.      As part of the scheme, ESM, Abundant, Wendt and Costabile targeted Christian faith-based communities by, among other things, touting that ESM would allocate a percentage of profits to support humanitarian relief efforts in Liberia.

5.      From at least December 2015 through April 2018, Palermo, through his company, PMI, with the assistance of ESM, Wendt and Costabile, fraudulently induced 22 investors to purchase an additional $501,906 in PMI securities, the proceeds of which were purportedly to be invested in ESM's mining business in Liberia.

6.      PMI and Palermo raised money for a diamond flipping program that they claimed to be running with ESM, claiming ESM would use the funds to purchase diamonds in Liberia for resale in Florida at a profit.  In fact, ESM could not export diamonds from Liberia at that time because ESM's diamond dealer license had expired.  Palermo misled prospective investors in another ESM-related mining investment by falsely stating that ESM had obtained financing in

the seven figure range for the project and that mining production could commence within two months, when, in fact, ESM did not have an agreement for the purported financing.

7.     Instead of using investor funds as promised, Palermo misappropriated the majority of the money he raised through PMI.  Palermo used investor funds to pay rent on his home, personal automobile loan payments and for household expenses, travel and entertainment expenses for his family and frequent purchases at restaurants, grocery, convenience and department stores.  Palermo also used investor funds to repay prior investors purported interest or profits distributions.

8.     By engaging in the conduct described in this Complaint, Defendants ESM, Abundant, Wendt, Costabile, PMI and Palermo violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

9.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], to enjoin such acts, transactions, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil penalties, and such other and further relief as the Court may deem just and appropriate.

10.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

11.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, certain of the acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the Western District of New York. In addition, Wendt and Costabile reside in this District, this District is the principal place of business for Abundant, the principal U.S. business office of ESM is located in this District and Wendt, Costabile, Palermo and PMI transact business in this District.

12.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, or instrumentalities of, interstate commerce, or the mails, or the facilities of a national securities exchange.

## **DEFENDANTS**

13.     **ESM** is a Wyoming limited liability company with its principal place of business in Monrovia, Liberia, and its principal U.S. office in Wendt's home in Hilton, New York.

14.     **Abundant** is a Wyoming limited liability limited partnership with its principal place of business in Hilton, New York. Abundant is controlled by Wendt and Costabile through its general partner, which is owned and controlled by Wendt and Costabile.

15.     **Wendt**, age 50, resides in Hilton, New York. Wendt has been the President of Defendant ESM and the President of the general partner of Defendant Abundant since their formation in August 2012 and August 2011, respectively.

16.     **Costabile**, age 44, resides in Fairport, New York. Costabile has been Secretary and Director of ESM and the Secretary and Director of the general partner of Defendant Abundant since their formation in August 2012 and August 2011, respectively.

17.     **PMI** is a Florida limited liability company, with its principal place of business in the home of Palermo, formerly in Safety Harbor, Florida and currently in Tarpon Springs, Florida.

18.     **Palermo**, age 46, resides in Tarpon Springs, Florida. Palermo has been the sole Manager of PMI since its formation in October 2015 and became Chief Investment Officer of ESM in 2016.

## FACTS

19.     Wendt and Costabile formed Abundant in August 2011, in order to raise funds for a gold mining operation in Liberia. Wendt and Costabile formed ESM in August 2012 to serve as the principal U.S. business office for their mining operation in Liberia.

20.     Palermo formed PMI in October 2015 purportedly as an investment group that would joint venture with ESM, with PMI providing investor funds to ESM, which purportedly would be used by ESM, Wendt and Costabile to generate returns for PMI investors.

21.     At all relevant times, PMI acted by and through Palermo.

### THE ESM AND ABUNDANT OFFERING FRAUD

22.     From at least September 2014 through December 2019, ESM, Abundant, Wendt and Costabile fraudulently induced at least 234 investors, located in multiple states, including New York, Pennsylvania and Florida to purchase at least $4.7 million in securities by making numerous material misstatements regarding the safety and security of the investments, the use of investor funds, the extent of ESM's assets and liabilities and ESM's historical production and profitability.

23.     In order to raise money to fund ESM's mining operations, Wendt and Costabile sold investments in three different investment programs: (1) the ESM Diamond Flipping

Program ("ESM DFP"); (2) the Abundant Limited Liability Limited Partnership; and (3) the ESM Garlo Joint Venture ("ESM Garlo JV").

24.     Wendt and Costabile marketed the securities in telephone calls, electronic mail and face-to-face meetings with prospective investors, targeting Christian faith-based communities. Wendt and Costabile conducted investor meetings at churches and encouraged new investments during telephone and web-conference meetings during which they prayed for the success of ESM's mining endeavors while touting that a portion of ESM's profits would be used for humanitarian relief in Liberia. Wendt and Costabile told prospective investors that investments with ESM and Abundant would aid development in Liberia while providing high rates of returns to investors.  Many of the investors were financially unsophisticated with limited investment experience.  Some investors purchased securities in two or more of the investment programs.

25.     Wendt and Costabile disregarded corporate formalities.  While they maintained multiple bank accounts for ESM and Abundant, they often deposited investor funds intended for one entity into the account of another entity.  Wendt and Costabile repeatedly moved funds through various accounts they controlled and comingled investor funds for the ESM DFP with the investor funds raised for ESM's mining operations through Abundant.

**A.  ESM Diamond Flipping Program**

   **i.     Wendt, Costabile and ESM Sold Over $1 Million in Investments in the ESM DFP**

26.     Between September 2014 and September 2015, ESM, Wendt and Costabile sold $1,020,550 in securities to at least 30 investors for the ESM DFP.

27.     The securities that Wendt and Costabile sold to investors for the ESM DFP took the form of "loan agreements," in which Wendt, Costabile and ESM promised investors that they

would receive monthly interest payments of 10% and the return of their principal within two to four months.  The loan agreements also provided investors with the option of reinvesting their accrued interest as principal and of extending the term of the loan so they could continue to accrue interest.

28.     Wendt and Costabile solicited investors to purchase the ESM DFP securities using a set of written offering documents that they authored together.  The offering documents referred to the loan agreements as a "speculative venture," and a spreadsheet provided to each ESM DFP investor identified the principal amount of the loan as the "total amount invested."

29.     In the offering documents, ESM, Wendt and Costabile told prospective investors that investor funds would be used to purchase diamonds in Liberia that would be exported to the United States for resale, which purportedly would generate sufficient profits to both pay the monthly interest payments to ESM DFP investors and create an additional income stream for ESM's mining operations.

30.     ESM DFP investors made payments of money to ESM and, in exchange, received a loan agreement signed by Wendt on behalf of ESM.

31.     Some ESM DFP investors wired their purchase payments directly to ESM's bank accounts controlled by Wendt and Costabile.  Others sent their payments to ESM through the mail or by hand-delivery.

### ii.     Wendt, Costabile and ESM Misled ESM DFP Investors

32.     ESM, Wendt and Costabile made material misrepresentations to ESM DFP investors relating to the safety and security of ESM DFP investments and the use of investor funds.

33.     In written offering documents distributed to prospective investors to induce them to invest in the ESM DFP, Defendants ESM, Wendt and Costabile falsely stated that:

    a.   the investments in the ESM DFP were "secured" and that the minimum cash value of the investments "will always be maintained as cash in the program's bank account or in the form of diamond assets"; and

    b.   the ESM DFP would generate sufficient cash flow to provide both "a great return" to the ESM DFP investors of "10% interest per month" and "for ongoing ESM operations and equipment purchases" and that "all proceeds from this program are first allocated to the payment of interest and final payout of principal per" the ESM DFP loan agreement.

34.     Contrary to the representations in the offering materials, the ESM DFP did not operate or perform as claimed.

35.     Wendt and Costabile also did not segregate ESM DFP funds from ESM's other operating accounts as promised.  ESM actually used only a portion of the money invested in the ESM DFP to purchase diamonds.  From the outset, Wendt and Costabile siphoned some of the ESM DFP investor money out of the program and used it—not profits—to fund ESM's other mining operations.

36.     For example, during the first two months the ESM DFP operated, ESM raised over $590,000 from investors. Of that amount, ESM, Wendt and Costabile used only $390,900 to purchase diamonds. The remainder was spent on other expenses for ESM's mining operations.

37.     Moreover, ESM, Wendt and Costabile actually lost money on the diamond flipping transactions they did undertake. While ESM purchased $390,900 in diamonds between

September and October of 2014, ESM received less than $316,000 from its diamond broker in Florida when it resold those diamonds.  None of this was disclosed to investors.

38.     Despite these losses, Wendt and Costabile encouraged investors to let their investments roll over beyond the two to four months referenced in the loan agreement, so they could continue accruing interest. In emails signed by both men, Wendt and Costabile told investors that ESM had conducted diamond flips, and they sent updated spreadsheets to the investors indicating that their ESM DFP investments had accrued 10% interest each month from the diamond flipping transactions.

39.     ESM, Wendt and Costabile continued operating the ESM DFP until December 2015 only because of the influx of new ESM DFP investments and most investors agreed to roll over their investments based on ESM's promise they could continue earning 10% monthly interest.

40.     Wendt and Costabile knew that ESM failed to invest much of the DFP investments as promised and lost money on the diamond flipping transactions they did undertake, and had no reasonable basis to claim that the ESM DFP could generate the promised 10% monthly return.

41.     By December 2015, the ESM DFP was insolvent. Wendt and Costabile used the proceeds from the last diamond flip on mining operations and to make interest payments to a few investors, however, ESM still owed over $995,000 in principal and $2.2 million in interest to the ESM DFP investors that ESM could not repay.

### B.  Abundant Limited Liability Limited Partnership

### i.      Wendt, Costabile and Abundant Sold Over $500,000 in Investments in Abundant Since January 2016

42.     Wendt and Costabile began raising money for ESM through Abundant in 2013. At that time, ESM had six general partners, including Wendt and Costabile.  In early January 2016, the other four general partners officially separated from ESM with Wendt and Costabile maintaining control of ESM.

43.     By January 2016, ESM had spent all of the money it had previously raised through the ESM DFP and Abundant. Wendt and Costabile began seeking new investments through Abundant for ESM.

44.     Between January 2016 and December 2016, Wendt and Costabile, through Abundant, offered and sold securities totaling at least $559,000 to at least 105 investors.

45.     Abundant, Wendt and Costabile told prospective investors that Abundant had a 40% ownership interest in ESM and that their investments in Abundant would be used to fund ESM's mining operations in Liberia.

46.     The securities that Wendt and Costabile sold to investors in Abundant took the form of limited liability limited partnership interests.  Wendt, Costabile and Abundant promised limited partner investors that they would receive a pro rata distribution of the profits Abundant received from ESM's mining operation.

47.     Wendt and Costabile solicited investors at in-person meetings and by sending email about the company to prospective investors.

48.     Wendt and Costabile also solicited investors to purchase the Abundant securities using a set of written offering documents that they authored together.  The offering documents referred to each limited partner's capital contribution as "investment capital" and the purchase

agreement for the limited partnership interest referred to Abundant as a "speculative venture" and contained certain financial disclosures regarding the company.

49.     Abundant investors made payments of money to Abundant and, in exchange, received a purchase agreement signed by Wendt on behalf of the general partner of Abundant.

50.     Some Abundant investors wired their purchase payments directly to Abundant's bank accounts, which are controlled by Wendt and Costabile.  Others sent their payments to Abundant through the mail or by hand-delivery.

      **ii.**    **Wendt, Costabile and Abundant Misled Abundant Investors**

51.     Abundant, Wendt and Costabile misled Abundant investors about the extent of ESM's outstanding liabilities and assets after the partner separation, ESM's historical mining production rates, and the profitability of the ESM DFP.

52.     At an investor meeting on January 22, 2016, Wendt falsely stated that at the time of the partner separation in January 2016, ESM had only $200,000 in liabilities, which ESM split evenly with the separating partners, and that ESM oftentimes generated $200,000 per month from its gold mining operation.

53.     Similarly, a January 25, 2016 email to prospective investors, which was sent by Wendt and signed by Wendt and Costabile, falsely stated that at the time of the partner separation, ESM's liabilities were split evenly with the separating partners and that the gold mining operation had covered all of ESM's operating expenses.

54.     Contrary to the representations made by Wendt at the January 2016 investor meeting and in the January 2016 email authored by Wendt and Costabile, at the time of the partner separation, ESM had outstanding liabilities of over $4.3 million and the separating

partners assumed responsibility for only $200,000 of ESM's outstanding liabilities, leaving ESM with responsibility for the remainder of more than $4 million.

55.     Also contrary to Wendt's representations at the January 2016 investor meeting and the January 2016 email authored by Wendt and Costabile, ESM did not ever—let alone often—generate $200,000 per month from its gold mining operation and the gold mining revenue did not cover ESM's operating expenses. In fact, ESM's total annual gold production in 2015 was less than $100,000.

56.     Written offering documents authored by Wendt and Costabile for Abundant and distributed to prospective investors to induce them to invest in Abundant, also falsely stated that:

     a.   ESM had infrastructure worth $11 million; and

     b.   the ESM DFP had great short term results and was one of the best things ESM ever did.

57.     Contrary to these representations, ESM did not have infrastructure worth $11 million after the partner separation. ESM's financial statements reflected that ESM had current and fixed assets of only $1.1 million after the partner separation.

58.     Furthermore, ESM did not have great short term results with the ESM DFP, but actually lost money on its diamond flipping transactions.

59.     Wendt and Costabile knew that their representations on behalf of Abundant regarding ESM's outstanding liabilities at the time of the partner separation, its historical mining production rates, the value of its infrastructure assets and the profitability of the ESM DFP were false.

### C.  ESM Garlo Joint Venture

**i.        Wendt, Costabile and ESM Sold over $3.1 Million in Investments in the ESM Garlo Joint Venture**

60.     Between January 2017 and December 2019, ESM, Wendt and Costabile sold at least $3,140,000 in securities to at least 158 investors for the ESM Garlo JV.

61.     The securities that ESM, Wendt and Costabile sold to investors for the ESM Garlo JV took the form of joint venture interests.

62.     Wendt and Costabile solicited investors to purchase the ESM Garlo JV securities using a set of written offering documents that they authored together for ESM.  The offering documents referred to each joint venture investor's capital contribution as "investment capital."

63.     The offering documents told prospective joint venture investors that their investments would be used to fund ESM's mining operations in Liberia at ESM mining sites along the Garlo river.

64.     The offering documents provided that investors would receive 20% of the principal balance of their investment every 30 days when mining production commenced at the Garlo site, until they recovered their principal investment plus 100% profit.

65.     ESM Garlo JV investors made payments of money to ESM and, in exchange, received an ESM Garlo Joint Venture Agreement signed by Wendt on behalf of ESM.

66.     Some ESM Garlo JV investors wired their purchase payments directly to ESM bank accounts controlled by Wendt and Costabile.  Others sent their payments to ESM through the mail or by hand-delivery.

ii.        **Wendt, Costabile and ESM Misled Garlo JV Investors**

67.        The ESM Garlo JV offering documents, which Wendt and Costabile prepared and provided to prospective investors, provided misleading information about ESM's expenses and unreasonable profit projections.

68.        The offering documents stated that ESM could generate monthly revenues of $2,790,000 in gold and diamonds with monthly expenses of $921,700 resulting in monthly profits of $1,868,300.

69.        These projections were substantially inflated because they were based on vastly understating royalties that ESM was required to pay to the Garlo site owner.  The offering documents falsely claimed that ESM was required to pay royalties at a rate of only 20% of revenue when, in fact, ESM was obligated to pay royalties of 55% to the site owner.

70.        The projections also failed to include substantial expenses incurred by ESM including salary payments made to Wendt, travel expenses for ESM staff who resided in the U.S. and travelled to and from Liberia, diamond export taxes imposed by the Liberian government and other overhead expenses.

71.        Wendt and Costabile knew that their representations regarding the amount of royalties owed to the Garlo site owner were false and that they failed to include other expenses incurred by ESM, all of which had the effect of falsely inflating their profit projections for the ESM Garlo JV.

**THE PMI OFFERING FRAUD**

72.        From at least December 2015 through April 2018, PMI and Palermo, with the assistance of ESM, Wendt and Costabile, fraudulently induced at least 22 investors to purchase at least $501,906 in securities by making material misstatements and omissions regarding the

safety and security of the PMI investments, the use of PMI investor funds and the profitability of PMI investments.

73.     Palermo sold investments in two different investment schemes: (1) the PMI Diamond Flipping Program ("PMI DFP"); and (2) the PMI Garlo Joint Venture ("PMI Garlo JV").

74.     PMI and Palermo marketed the securities in telephone calls, electronic mail, telephone and web conferences and face-to-face meetings with prospective investors.  Many of the investors were financially unsophisticated with limited investment experience.

   **A.     PMI DFP**

   **i.     Palermo and PMI Sold Over $250,000 in Investments in the PMI DFP**

75.     Between December 2015 and December 2016, PMI and Palermo sold at least $258,360 in securities to at least 14 investors through the PMI DFP offering.

76.     The securities that Palermo sold to investors in connection with the PMI DFP took the form of promissory notes, in which PMI promised investors that they would receive 20% interest on the amount of their investment as well as the return of their principal within three months.

77.     PMI and Palermo solicited investors to purchase the securities using written offering documents and newsletters that Palermo authored and emailed to prospective investors. The offering documents referred to the promissory notes as an "investment opportunity," and described PMI's diamond flipping program and the proposed terms of the offering.

78.     PMI and Palermo told prospective investors that their investments would be used by ESM for the purpose of purchasing diamonds in Liberia, which would be exported to Florida for resale at a profit.

79.     PMI and Palermo stated in the offering documents and the newsletters that investors would receive quarterly interest payments of 20% of their principal investment and referred to those interest payments as "profit payouts."

80.     Investors made payments of money to PMI and, in exchange, received a promissory note signed by Palermo on behalf of PMI.

81.     Some investors wired their purchase payments directly to a PMI bank account controlled by Palermo.  Others sent their payments to Palermo through the mail or by hand-delivery.

82.     Palermo frequently moved investor funds from PMI's account to his own personal account commingling investor funds with the assets in his personal account.

**ii.     Palermo, Wendt, Costabile and PMI Misled PMI DFP Investors**

83.     Contrary to the representations in the offering materials, when Palermo and PMI were soliciting investments for the PMI DFP, PMI could not operate the diamond flipping program with ESM because ESM's diamond dealer license had expired in October 2015.  ESM did not renew its diamond dealer license at any time during 2016.  Without a diamond dealer license issued by the Liberian government, ESM could not export diamonds from Liberia and ESM could not generate profits for investors through diamond flipping transactions.

84.     Moreover, contrary to PMI's and Palermo's representations that the PMI DFP investor funds would be used by ESM to purchase diamonds for the purported diamond flipping program, Palermo actually sent very little money to ESM. Instead, Palermo misappropriated the majority of the PMI DFP investor funds for his personal use and used a portion of the investor funds to make interest payments to prior PMI DFP investors.

85.    In telephone conferences with prospective investors, Palermo, Wendt and Costabile also made oral misrepresentations to prospective investors to induce them to invest in the PMI DFP.  For example:

a.    During a February 2016 telephone conference, Palermo falsely stated that ESM's export of diamonds was safe and secure because ESM had obtained a $500,000 insurance policy from Lloyd's of London covering its diamond exports;

b.    During a February 2016 telephone conference, Wendt falsely stated that ESM generated a 52% net profit margin on the diamond transactions in the prior ESM DFP; and

c.    During a November 2016 telephone conference, Costabile falsely stated that the PMI DFP investment was "safe" because the capital "within the program is either always with us in the form of the liquid capital or the value of the stones."

86.    Contrary to Palermo's oral representations, ESM did not obtain a $500,000 insurance policy from Lloyd's of London for its export of diamonds.

87.    Palermo knew that ESM did not actually obtain the insurance policy. Palermo was the person who worked on behalf of ESM in late 2015 and early 2016 trying to obtain insurance coverage for ESM's diamond exports, he knew that ESM had not implemented security measures required by the insurance broker and he knew that ESM did not obtain the insurance policy.

88.    Contrary to Wendt's oral representations to prospective PMI DFP investors, ESM did not earn a 52% net profit margin on its prior diamond flipping transactions. Instead, ESM actually lost money on its diamond flipping transactions through the ESM DFP.

17

89.     Wendt knew that ESM had lost money on its ESM DFP and that ESM did not have a 52% net profit margin on its diamond flipping transactions.

90.     Contrary to Costabile's oral representations to prospective PMI DFP investors, PMI DFP investments were not safe and were not secured by diamonds purchased by ESM.

91.     Costabile knew that, in reality, ESM used only a portion of the money invested in the ESM DFP to purchase diamonds and that ESM, Wendt and Costabile had siphoned some of the ESM DFP investor money out of the program and used it cover mining operational expenses.

92.     Palermo encouraged PMI DFP investors to let their investments roll over beyond the three months referenced in the promissory notes, so they could continue accruing interest. Palermo told investors in emails that ESM had conducted diamond flips for PMI and that PMI had paid out 20% profits at quarterly intervals during 2016.  These statements were false.

93.     In addition, Wendt played a further role in the fraud by participating in roundtrip transactions with PMI DFP investor funds. In particular, Palermo sent a small portion of the PMI DFP investor funds to ESM, and Wendt promptly returned those same funds to PMI ostensibly for PMI "DFP Payouts", which created the illusion that ESM was generating profits from diamond flipping transactions, when in fact, no diamond flipping transactions had occurred.

**B.     PMI Garlo JV**

**i.      Palermo and PMI Sold Over $240,000 in Investments in the PMI Garlo JV**

94.     Between January 2017 and April 2018, PMI sold at least $243,546 in securities to at least 9 investors for the PMI Garlo JV.

95.     The securities that PMI and Palermo sold to investors for the PMI Garlo JV took the form of joint venture interests.

96.     Palermo solicited investors to purchase the PMI Garlo JV securities using a series of written newsletters that Palermo authored.  The newsletters referred to joint venture participants as "investors" and contributions by joint venture participants as "investor capital."

97.     In the newsletters, PMI and Palermo told prospective joint venture investors that they would have a joint venture interest in ESM's Garlo mining site through an investment in PMI.  PMI and Palermo claimed that PMI Garlo JV investments would be used for the purpose of funding ESM's mining operations in Liberia at ESM mining sites along the Garlo river.

98.     PMI and Palermo promised PMI Garlo JV investors that when ESM commenced mining production at mining sites along the Garlo river they would receive 20% of the principal balance of their investment every 30 days.

99.     PMI Garlo JV investors made payments of money to PMI and, in exchange, received a PMI Garlo Joint Venture Agreement signed by Palermo on behalf of PMI.

100.    Some PMI Garlo JV investors wired their purchase payments directly to PMI bank accounts controlled by Palermo.  Others sent their payments to PMI through the mail or by hand-delivery.

**ii.     Palermo and PMI Misled PMI Garlo JV Investors**

101.    Contrary to the representations about how PMI Garlo JV investor funds would be used, Palermo actually invested only a portion of the money that he raised through the sale of PMI Garlo JV securities with ESM.  Instead, as discussed in greater detail below, Palermo misappropriated the majority of the investor funds for his personal use and used some investor funds to make interest payments to prior PMI investors.

102.    In addition, Palermo misled investors about the operation of the ESM Garlo site. In a December 2017 newsletter/email, Palermo falsely stated that ESM had obtained financing in

the seven figure range that would allow ESM's Garlo site to become fully mechanized and

mining production could commence within two months.

103.     Contrary to Palermo's representations, ESM did not have a signed agreement for

seven figure financing for the Garlo mining site. In fact, ESM never obtained an agreement for

financing in the seven figure range.

104.     Palermo knew that ESM did not have a signed agreement for additional financing

and that full mechanized mining production at Garlo could not commence within 2 months.

**C.     Palermo Misused Investor Funds**

105.     PMI and Palermo claimed in written offering documents and newsletters that

investor funds for the PMI DFP would be used for the purchase of diamonds for diamond

flipping transactions and that investor funds for the PMI Garlo JV would be used to fund ESM's

operations at mining sites along the Garlo river.

106.     Palermo also made oral representations to investors and prospective investors that

PMI DFP investments would be used to purchase diamonds for diamond flipping transactions

and that PMI Garlo JV investments would be used to fund ESM's mining operations along the

Garlo river.

107.     Contrary to what investors were told in writing and orally, Palermo used the

majority of investor funds in ways not disclosed to investors.

108.     For instance, without disclosing it to investors, Palermo misappropriated

$340,005 of investor funds to benefit himself and his family.

109.     Palermo used investor funds to pay his personal expenses, including, among other

things, the rent on his home, personal automobile loan payments, household expenses, travel and

entertainment expenses for his family and frequent purchases at restaurants, grocery, convenience and department stores.

110.    Palermo also spent $80,623 to make purported interest or profit payments to prior investors.  These payments were made to further the fraud by maintaining the appearance that PMI's business was performing as represented.

111.    PMI and Palermo did not disclose to investors that they planned to, or did in fact, use investor money for Palermo's personal benefit, or that they used money from new investors to repay earlier investors.

## ESM, ABUNDANT, WENDT AND COSTABILE VIOLATED THE FEDERAL SECURITIES LAWS

112.    During the relevant period, Wendt and Costabile owned, operated, and controlled ESM and Abundant.

113.    The ESM DFP loan agreements, Abundant limited liability limited partnership interests and ESM Garlo JV joint venture interests offered and sold to investors are securities within the meaning of both the Securities Act and the Exchange Act.

114.    In connection with the sales or offers to sell securities, ESM, Abundant, Wendt and Costabile made use of means or instruments of interstate transportation or communication in interstate commerce or of the mails, including using the internet, interstate phone calls, and the United States mail. The conduct described herein was in the offer or sale of securities and in connection with the purchase or sale of securities.

115.    The misrepresentations and omissions set forth herein, individually and in the aggregate, are material.  A reasonable investor would have considered the misrepresented facts and omitted information—including, among other items, misrepresentations about the safety and security of the investments, the use of investor funds, the extent of the companies' assets and

liabilities and the companies' historical production and profitability—important in deciding whether or not to purchase ESM DFP loan agreements, Abundant limited liability limited partnership interests and the ESM Garlo joint venture interests. Disclosure of the accurate facts or omitted information would have altered the "total mix" of information available to investors.

116.    In connection with the conduct described herein, ESM, Abundant, Wendt and Costabile acted knowingly and/or recklessly and negligently.

117.    ESM, Abundant, Wendt and Costabile were each makers of false and misleading statements made in writing and orally regarding ESM and Abundant.  Wendt and Costabile prepared the offering documents, the ESM DFP loan agreements, the Abundant purchase agreements and the ESM Garlo Joint Venture agreements provided to investors on behalf of ESM and Abundant. Wendt signed each of the loan agreements, purchase agreements and joint venture agreements accepting the investments. Wendt and Costabile also were makers of the false and misleading statements made orally regarding the PMI DFP.

118.    Through their material misrepresentations and omissions, ESM, Abundant, Wendt and Costabile each obtained money or property from investors.

119.    Through this scheme, ESM, Abundant, Wendt and Costabile each engaged in acts, transactions or courses of business that operated as a fraud or deceit upon offerees, purchasers and prospective purchasers of the securities described herein.

**PMI AND PALERMO VIOLATED THE FEDERAL SECURITIES LAWS**

120.    During the relevant period, Palermo owned, operated, and controlled PMI.

121.    The PMI DFP promissory notes and PMI Garlo JV joint venture interests offered and sold by Palermo to investors are securities within the meaning of both the Securities Act and the Exchange Act.

122.    In connection with the sales or offers to sell, PMI and Palermo made use of means or instruments of interstate transportation or communication in interstate commerce or of the mails, including using the internet, interstate phone calls, and the United States mail.  The conduct described herein was in the offer or sale of securities and in connection with the purchase or sale of securities.

123.    The misrepresentations and omissions set forth herein, individually and in the aggregate, are material.  A reasonable investor would have considered the misrepresented facts and omitted information—including, among other items, misrepresentations about the safety and security of the investments, the use of investor funds and the profitability of PMI investments— important in deciding whether or not to purchase PMI DFP promissory notes or the PMI Garlo joint venture interests.   Disclosure of the accurate facts would have altered the "total mix" of information available to investors.

124.    In connection with the conduct described herein, PMI and Palermo acted knowingly and/or recklessly and negligently.

125.    PMI and Palermo were makers of false and misleading statements made in writing and orally regarding PMI.  Palermo prepared the offering documents, the PMI DFP promissory notes and the PMI Garlo joint venture agreements provided to investors on behalf of PMI. Palermo signed each of the promissory notes and joint venture agreements accepting the investments.

126.    Through their material misrepresentations and omissions, PMI and Palermo obtained money or property from investors.

127.    Through this scheme, PMI and Palermo each engaged in acts, transactions or courses of business that operated as a fraud or deceit upon offerees, purchasers and prospective purchasers of the promissory note and joint venture investments.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations of Section 17(a) of the Securities Act

**(Against All Defendants)**

128.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 127, inclusive, as if they were fully set forth herein.

129.    By engaging in the conduct described above, Defendants ESM, Abundant, Wendt, Costabile, PMI and Palermo in the offer or sale of securities, directly or indirectly, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a.    knowingly or recklessly employed one or more devices, schemes, or artifices to defraud;

    b.    knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or an omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

130.     By engaging in the foregoing conduct, Defendants ESM, Abundant, Wendt, Costabile, PMI and Palermo, directly or indirectly, singly or in concert, violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

**(Against All Defendants)**

131.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 127, inclusive, as if they were fully set forth herein.

132.      By engaging in the conduct described above, Defendants ESM, Abundant, Wendt, Costabile, PMI and Palermo, directly or indirectly, singly or in concert, knowingly or recklessly, in connection with the purchase or sale of securities and by the use of any means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

     a.   employed one or more devices, schemes, or artifices to defraud;

     b.   made one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

     c.   engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

133.     By engaging in the foregoing conduct, Defendants ESM, Abundant, Wendt, Costabile, PMI and Palermo, directly or indirectly, singly or in concert, violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a final

judgment:

**I.**

Permanently restraining and enjoining Defendants ESM, Abundant, Wendt, Costabile,

PMI and Palermo and their agents, servants, employees and attorneys and all persons in active

concert or participation with any of them from violating, directly or indirectly, Section 17(a) of

the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendant Palermo to disgorge any and all ill-gotten gains derived from the

activities set forth in this Complaint, together with prejudgment interest thereon;

**III.**

Ordering Defendants Wendt, Costabile and Palermo to pay civil penalties under Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15

U.S.C. § 78u(d)]; and

**IV.**

Granting such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

Date:  March 1, 2021

  s/ Julia C. Green
Julia C. Green
Jennifer Chun Barry
Kingdon Kase
Patricia A. Kuzma Trujillo

SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100
Facsimile:   (215) 597-2740
GreenJu@sec.gov